**SOUTH CENTRAL BANK
OF DAVIESS COUNTY,
Appellant–Plaintiff,**

v.

**LYNNVILLE NATIONAL BANK, Bryan
K. Fisher, and Lisa C. Fisher, Appellees–Defendants.**

**No. 87A01–0806–CV–256.**

Court of Appeals of Indiana.

Feb. 20, 2009.

Garret B. Hannegan, John T. McGarvey, Morgan & Pottinger, P.S.C., Louisville, KY, Attorneys for Appellant.

Mark E. Neff, Mark E. Neff Law Office, P.C., Boonville, IN, Peter J. Rusthoven, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellee, Lynnville National Bank.

## OPINION

BAKER, Chief Judge.

Although Indiana adopted Article 3 of the Uniform Commercial Code decades ago, we have not had occasion in this State to consider the propriety of a bank's refusal to pay a cashier's check. Thus, this appeal presents an issue of first impression in Indiana, namely, under what circumstances—if any—an issuing bank may properly refuse to pay a cashier's check.

Appellant-plaintiff South Central Bank of Daviess County (South Central) appeals the trial court's order denying South Central's motion for partial summary judgment and granting appellee-defendant Lynnville National Bank's (Lynnville) motion for summary judgment on South Central's complaint against Lynnville. Specifically, South Central alleges that the trial court erred by concluding that Lynnville was entitled to refuse to pay a cashier's check that it had issued. Finding that Lynnville wrongfully refused to pay the cashier's check, that none of the applicable defenses are available to Lynnville, and that South Central did not fail to mitigate its damages, we reverse and remand with instructions to enter final judgment in South Central's favor in the amount of the original cashier's check—$31,917.55—plus expenses, interest, and consequential damages, if any, to be determined by the trial court.

## FACTS [1]

The parties entered into a joint stipulation of the undisputed facts. In 2004, appellees-third-party-defendants Bryan K. and Lisa C. Fisher were searching for a manufactured home and encountered the sales lot of an Owensboro, Kentucky, company that claimed to sell manufactured

---

1. We held oral argument on February 3, 2009. We thank counsel for their written and oral presentations and for making the snowy drive to get here.

housing—Landmark Housing Center, Inc. (Landmark). Landmark was a registered dealer for a Texas company called Patriot Homes, Inc. (Patriot), until May 20, 2004.

On May 7, 2004, the Fishers signed a contract with Landmark to purchase a manufactured home made by Patriot. On June 1, 2004, the Fishers borrowed $31,917.55 from Lynnville to make a down payment of one-half of the home's purchase price to Landmark. As collateral for the loan, Lynnville was to be a lienholder on the home. Lynnville issued the proceeds of the loan in the form of a cashier's check made payable to Landmark. Appellant's App. p. 13. The same day, the Fishers delivered the cashier's check to Landmark and Landmark deposited the cashier's check into its business checking account with South Central and requested immediate funds.

South Central's branch manager telephoned Lynnville and confirmed the date, amount, and payee of the cashier's check. The Lynnville employee explained that the funds were for the purchase of a manufactured home. South Central's branch manager later attested that the Lynnville employee said that the cashier's check was "good" or "fine," but the employee denied making such a statement. *Id.* On the same day—June 1, 2004—South Central gave unfettered and immediate cash and credit to Landmark after the cashier's check was deposited into Landmark's account.

On June 3, 2004, an employee of Patriot called the Fishers and informed them that Landmark was no longer a dealer for Patriot. Lisa Fisher then called Lynnville to report that Landmark could not fulfill its contract and that it had allegedly defrauded the Fishers by representing itself as a dealer for Patriot. Lynnville confirmed with Patriot that Landmark was not, in fact, an authorized dealer for Patriot. The Fishers directed Lynnville to inform South Central of Landmark's suspected fraud and to stop or refuse payment on the cashier's check.

At approximately 10:00 a.m. on June 3, 2004, a Landmark employee issued and South Central paid a check for $24,000, which was written to South Central in exchange for a $24,000 cashier's check made payable to James Rice, a Landmark principal. Appellant's App. p. 402–03. South Central received the phone call from Lynnville regarding Landmark's suspected fraud and Lynnville's refusal to honor the Fishers' cashier's check at approximately 1:45 p.m., after the proceeds of the Fishers' check had already been paid out of Landmark's account. After notification of Lynnville's refusal to pay, South Central took no steps to retrieve, set off, or halt the withdrawal of any funds by Landmark. The following day, on June 4, 2004, South Central paid the $24,000 cashier's check upon presentment by Rice.[2] Thus, South Central emphasizes that it "paid out $32,388.00 (i.e., the entire credit from the deposit of the [Fishers' cashier's check]) from the account *prior to notice from Lynnville of its intent not to pay the Check,* and it cleared the $24,000.00 cashier's check it issued after such notice." Appellant's Br. p. 10 (emphasis in original).

On September 14, 2004, South Central filed a complaint against Lynnville, alleging that Lynnville had wrongfully refused payment on the $31,917.35 cashier's check payable to Landmark, seeking the amount of the check plus prejudgment interest, attorney fees, and costs. Lynnville denied liability and contended that South Central had failed to mitigate its damages. On October 13, 2004, Lynnville filed a third-

---

**2.** At some point, Rice and Landmark declared  bankruptcy.

party complaint against the Fishers, asserting that the Fishers had signed an indemnity agreement when Lynnville agreed to stop payment on the check.

On August 25, 2006, South Central filed a motion for partial summary judgment, seeking judgment against Lynnville in the amount of the check plus statutory interest, leaving a determination on South Central's claim for attorney fees and costs for a later date. On November 20, 2006, Lynnville filed a cross-motion for summary judgment, requesting that judgment be entered in its favor. Following a December 6, 2007, hearing, the trial court entered an order on May 7, 2008, granting Lynnville's cross-motion for summary judgment and denying South Central's motion for partial summary judgment. Among other things, the court held as follows:

6. A cashier's check, under the UCC, is a creature of statutory definition. But, due diligence, reasonableness, duty of care, responsibility, usage, custom, and ordinary care are part of the UCC.

7. [South Central] violated its duties by failing in its obligation to protect not only itself, but the other parties by failing to exercise due diligence, reasonableness, duty of care, responsibility, usage, custom, and ordinary care.

8. If [South Central] had acted reasonably, prudently, and in accord with banking usage and custom, then only [South Central's] customer, Landmark [ ] or its principals, would have suffered.... [South Central's] actions taken on June 3 and June 4 are fatal to its position.

9. On June 3, [South Central] had $28,000 in Landmark's account. When Lynnville [ ] called [South Central, South Central] had issued two cashier's checks, either before

or after 2:00 p.m., to Landmark and to ... an employee of Landmark. By having been placed on notice, [South Central] could have stopped payment or refused payment on its checks. If it had done so, all parties would have been protected.

10. [South Central] failed in its duty by allowing immediate credit on June 1; [South Central] failed in its duty to protect itself and others by not refusing to pay $24,000 to Landmark [ ] and $4,188 to [a Landmark employee].

11. ... [W]hen two duties clash, one must prevail. The very beginning of the UCC indicates that custom, usage, and equity should prevail. [South Central] was under no duty to give immediate funds or immediate credit to Landmark or its principals. The availability of funds policy is written to favor customers so that a bank will not hold a customer's money too long. [South Central], however, failed to hold the funds at all, despite notices, warnings, and the requirements of good faith, due diligence, and ordinary care, and the status of a "troubled account". [South Central] should have known the risks, yet failed to protect itself and failed to mitigate its damages.

\* \* \*

14. [South Central] responded too quickly in violation of its own procedures and safety measure.

\* \* \*

18. Even though [South Central] states that there are certain assumptions about cashier's checks ..., assumptions are fraught with peril. As-

sumptions are *not presumptions,* which bear more deference.

19. Because the UCC is superceded [sic] by Regulation CC [and] limited by usage and custom, the definition of a cashier's check is not strictly applicable in this situation between two banks.

20. A bank *can* pay, but it does not say that a bank *must* pay. [South Central] was *entitled* to deposit the check and [South Central] is entitled to do whatever it wants with any of its papers. However, [South Central] cannot pass its loss onto Lynnville [ ].

\* \* \*

22. [South Central's] statements show that its actions were conditional and permissive, but never mandatory. [South Central] was not forced to cash the check, and the law provides for stopping payment on documents. Specifically, the law permits refusal and states that damages are only to be compensated if the stop payment was wrongful. Refusal of payment on a cashier's check is not always wrongful and a bank has a right to stop payment.

\* \* \*

It is the depositor, not the bank, who ultimately bears the risk of non-payment. Ultimately, the deposit of the check and giving of credit is provisional and non-binding unless and until sufficient time has elapsed to make it binding on the parties. Giving immediate credit or funds is simply not done by a prudent banker.

*Summary*

[South Central] had the right to protect itself, but it failed to do so. Lynnville [ ] had the right to protect itself and its customer; and it did so. [South Central] failed to protect itself and bears the risk of being damaged. [South Central] assumed the risk by not following its own written procedures; [South Central] cannot blame its loss on Lynnville [ ]. [South Central] assumed the risk, suffered the loss, and shall not be entitled to recover any monies from Lynnville [ ].

Appellant's App. p. 19–23 (emphases in original). South Central now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

### II. Refusal to Pay a Cashier's Check

As noted above, this appeal presents an issue of first impression in Indiana, namely, under what circumstances—if any—an issuing bank may properly refuse to pay a cashier's check. A cashier's check is "[a] check drawn by a bank on itself, payable to another person, and evidencing the pay-

ee's authorization to receive from the bank the amount of money represented by the check; a draft for which the drawer and drawee are the same bank, or different branches of the same bank." *Black's Law Dictionary* 230 (7th ed.1999); *see also* Ind. Code § 26–1–3.1–104(g) (defining "cashier's check" as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank"). Cashier's checks are generally treated the same as certified checks and teller's checks. *See, e.g.,* I.C. § 26–1–3.1–411 (entitled "[r]efusal to pay cashier's checks, teller's checks, and certified checks"). Among other courts, the Seventh Circuit has held that cashier's checks are somewhat akin to cash: "[b]y definition a cashier's check is a bill of exchange drawn by a bank upon itself and *accepted in advance by the act of issuance.*" *Munson v. Am. Nat'l Bank & Trust Co. of Chicago,* 484 F.2d 620, 623 (7th Cir.1973) (emphasis added); *see also Behavioral Health & Wellness, Inc. v. FDIC,* 802 So.2d 374, 376 (Fla.Dist.Ct.App.2001) (holding that "[i]n the business community, cashier's checks are treated as the next best thing to cash").

## A. Wrongful Refusal to Pay: General Rules

Indiana Code section 26–1–3.1–411 governs situations in which an obligated bank wrongfully refuses to pay a cashier's check:

(a) In this section, "obligated bank" means ... the issuer of a cashier's check....

(b) If the obligated bank wrongfully:

(1) refuses to pay a cashier's check ...;

\* \* \*

the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment and may recover consequential damages if the obligated bank refuses to pay after receiving notice of particular circumstances giving rise to the damages.

(c) Expenses or consequential damages under subsection (b) are not recoverable if the refusal of the obligated bank to pay occurs because:

(1) the bank suspends payments;

(2) the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument;

(3) the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument; or

(4) payment is prohibited by law.

This statute is the model version of Article 3 of the Uniform Commercial Code (UCC). The comments to this section of the UCC clarify the purpose of the section:

1. In some cases a creditor may require that the debt be paid by an obligation of a bank. The debtor may comply by obtaining certification of the debtor's check, but more frequently the debtor buys from a bank a cashier's check or teller's check payable to the creditor. *The check is taken by the creditor as a cash equivalent on the assumption that the bank will pay the check.* Sometimes, the debtor wants to retract payment by inducing the obligated bank not to pay. The typical case involves a dispute between the parties to the transaction in which the check is given in payment. *In the case of a certified check or cashier's check, the bank can safely pay the holder of the check despite notice that there may be an adverse claim to the check* (Section 3–602). It is also clear that the bank

that sells a teller's check has no duty to order the bank on which it is drawn not to pay it. *A debtor using any of these types of checks has no right to stop payment. Nevertheless, some banks will refuse payment as an accommodation to a customer. Section 3–411 is designed to discourage this practice.*

* * *

3. Subsection (c) provides that expenses or consequential damages are not recoverable if the refusal to pay is because of the reasons stated. The purpose is to limit that recovery to cases in which the bank refuses to pay even though its obligation to pay is clear and it is able to pay. Subsection (b) applies only if the refusal to honor the check is wrongful. If the bank is not obliged to pay there is no recovery. *The bank may assert any claim or defense that it has, but normally the bank would not have a claim or defense. . . .*

(Emphases added).

■ The language of the statute and the Comment could not be clearer. Only under certain, very specific circumstances is a bank entitled to stop payment on a cashier's check: first, if the bank suspends payments—becomes insolvent; second, if the bank has its *own* defense—as distinguished from its customer's defense—against the person entitled to enforce the instrument; third, if the bank has a reasonable doubt about the identity of the person demanding payment; and finally, if the payment is prohibited by law. I.C. § 26–1–3.1–411(c). None of those circumstances occurred in this case. Lynnville's obligation to pay was clear and it was able to pay, but it refused payment on the check as an accommodation to the Fishers, who had no right to make that request. *See* Official Comment 4 to I.C. § 26–1–4–403 (providing that "a customer purchas-

ing a cashier's check or teller's check has no right to stop payment of such a check" and that "[t]here is no right to stop payment after certification of a check or other acceptance of a draft, and this is true no matter who procures the certification"). This statute was enacted specifically to discourage that practice. Official Comment 1 to I.C. § 26–1–3.1–411.

Lynnville relies on the defense of fraud as its basis for stopping payment on the cashier's check. But we agree with South Central that "Lynnville cannot maintain an action of its own against Landmark for fraud. Lynnville was never a victim of fraud. Rather, it is Lynnville's customers who claim a fraud was perpetrated upon them by their seller, Landmark." Appellant's Br. p. 18–19. No interaction occurred between Lynnville and Landmark such that Lynnville can assert its *own* defense of fraud.

*B. Holder in Due Course*

Moreover, South Central argues that it was a holder in due course (HDC) of the cashier's check, which would further limit the defenses available to Lynnville. A "holder in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument:

(A) for value;

(B) in good faith;

(C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series;

(D) without notice that the instrument contains an unauthorized signature or has been altered;

(E) without notice of any claim to the instrument described in IC 26–1–3.1–306; and

(F) without notice that any party has a defense or claim in recoupment described in IC 26–1–3.1–305(a).

I.C. § 26–1–3.1–302.

■ On June 1, when a Landmark representative presented the cashier's check to South Central, South Central took the instrument for value and in good faith. That Landmark had a spotty history as a customer of the bank does not mean that South Central acted in bad faith by depositing the check. Acting with an abundance of caution, South Central telephoned Lynnville to confirm the date, amount, and payee of the check. Although South Central was not required to do so—and, to be clear, we do not intend to imply that the holder of a cashier's check is required to make such a phone call—that act certainly means that South Central was without notice of any problems with the instrument. Indeed, at that time, *Lynnville* was without notice of any problems with the instrument. Therefore, when South Central accepted the cashier's check on June 1, it became an HDC. The events that occurred after June 1 are irrelevant to the validity of the cashier's check on June 1 and South Central's status as an HDC. The clock stopped following presentment and acceptance.

Because South Central is an HDC, the only defenses that could be raised by Lynnville are the "real" defenses enumerated by Indiana Code section 26–1–3.1–305(a)(*l*):

(A) infancy of the obligator to the extent it is a defense to a simple contract;

(B) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor;

(C) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms; or

(D) discharge of the obligor in insolvency proceedings[.]

*See* I.C. § 26–1–3. 1–305(b) (explaining that the above-listed defenses are the only ones available against an HDC). None of these defenses apply to Lynnville—it is plainly not an infant, nor has it filed bankruptcy. There has been no suggestion of duress, lack of capacity, or illegality of the transaction between Lynnville and the Fishers. Finally, Lynnville's bank officer signed the cashier's check knowing exactly its amount and to whom it was payable, so the fraud defense is similarly inapplicable.[3]

Lynnville's only response to this argument is to state, with no supporting authority, that "Landmark committed a fraud on the Fishers and, as such, neither Landmark nor South Central were bona fide [HDCs]." Appellee's Br. p. 8. South Central responds by pointing out that

Landmark's fraud on the Fishers does not automatically spill over to South Central who had absolutely no knowledge of what Landmark did or did not

---

**3.** The Official Comment to UCC section 3–35(a)(1)(C) stresses that the "fraud" defense referred to by that subsection is " 'real' or 'essential' fraud, sometimes called fraud in the essence or fraud in the factum, as effective against [an HDC]. The common illustration is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document.... The test of the defense is that of excusable ignorance of the contents of the writing signed." This type of fraud is different from the type of fraud allegedly committed by Landmark against the Fishers.

promise the Fishers.... There is absolutely nothing in the cashier's check that in any way indicated what type of transaction was involved or what, if anything, had been promised to the Fishers.

Reply Br. p. 6. We agree. Between the limitations of Indiana Code sections 26–1–3.1–411 and 26–1–3.1–305, it could not be clearer that Lynnville was not entitled to stop payment on the cashier's check. It has no valid defense for that action.

### III. Mitigation of Damages

Given that Lynnville wrongfully refused to pay the cashier's check, South Central "is entitled to compensation for expenses and loss of interest resulting from the nonpayment and may recover consequential damages...." I.C. § 26–1–3.1–411(b). Lynnville argues, however, that South Central failed to mitigate its damages.

Initially, we note that Lynnville gave the Fishers a cashier's check in exchange for a lien on the home to be constructed but did no due diligence on Landmark before doing so. Lynnville neither phoned Landmark nor perfected its security interest. Therefore, we believe that it is Lynnville, rather than South Central, that should bear the risk of loss herein because it was the party best able to prevent the loss from occurring.

Risk of loss notwithstanding, we note that Lynnville argues that South Central failed to abide by its own policy providing for a delay in payment to its customers. South Central's "Funds Availability Policy" provides as follows:

Our general policy is to allow you to withdraw funds deposited in your account on the next business day after the day we receive your deposit. In some cases, we may delay your ability to withdraw funds beyond the next ... business day. The funds will generally be available by the fifth business day after the day of deposit.

Appellant's App. p. 387. Lynnville argues that, given Landmark's history of unreliability as a South Central customer and its request for immediate funds, South Central failed to exercise ordinary care by giving Landmark immediate access to the deposited funds. We cannot agree. Even if the policy had been followed, Landmark would have had access to the funds on the next business day following deposit, which would have been June 2. But it was not until June 3 that Lynnville notified South Central of Landmark's alleged fraud. Thus, in either scenario, South Central would have already given Landmark access to the funds by the time Lynnville picked up the telephone. The Funds Availability Policy, therefore, is of no help to Lynnville.

Along the same lines, Lynnville argues that South Central failed to exercise ordinary care. A collecting bank must exercise ordinary care in presenting an item or in sending an item for presentment. I.C. § 26–1–4–202(a)($l$). "Ordinary care" means "observance of reasonable commercial standards prevailing in the area in which the person is located, with respect to the business in which the person is engaged." I.C. § 26–1–3.1–103(7). According to Lynnville, South Central failed to exercise ordinary care when it (1) relied on a statement allegedly made by a Lynnville employee that the cashier's check was good; (2) gave immediate funds and credit to Landmark after the cashier's check was deposited; and (3) paid the $24,000 cashier's check to Landmark upon presentment even though it had notice of Landmark's alleged fraud against the Fishers.

First, as to the phone call made from South Central to Lynnville, as noted above, South Central merely sought to confirm that the check was genuine by

verifying the date, amount, and payee of the check. We again emphasize that South Central was not obligated to make such a phone call, and certainly do not conclude that its decision to do so and rely on the affirmation of Lynnville was a failure to act with ordinary care. Second, as to South Central's decision to give immediate funds and credit to Landmark after the cashier's check was deposited, we note that Lynnville concedes that South Central was entitled to take that action. Appellee's Br. p. 19. While Landmark may have been an unreliable customer of South Central, nothing in these facts, the law, or South Central's policy leads us to conclude that its decision to give immediate credit to South Central was an action taken without ordinary care.

Third, as to South Central's decision to pay its cashier's check upon presentment by Rice, we observe that South Central merely recognized that the law applies equally to South Central and Lynnville. Therefore, had South Central refused to pay the cashier's check, it would have been a wrongful refusal pursuant to all of the law cited and discussed above. South Central would have had no greater right to refuse to pay the cashier's check payable to Rice than Lynnville did with respect to the Fishers' cashier's check. Therefore, we conclude that South Central did not fail to exercise ordinary care when it paid that check.

Finally, Lynnville directs our attention to the Federal Expedited Funds Availability Act[4] and Federal Regulation CC, which directs banks to formulate and provide a funds availability policy that provides a schedule for withdrawals and declares that funds will not be available until a later date. 12 C.F.R. § 229.15. According to Lynnville,

[s]uch policies allow a depositary bank time to collect the funds from the payor bank and allow the payor bank either to transmit funds or return items before the deposit is available for withdrawal from the customer's account. Inherent in Regulation CC are approved governmental standards for a bank to follow: protect the bank by allowing time to ensure that a transaction occurs as desired and don't hold onto money so long as to be unfair to the customer or so as to profit excessively.

Appellee's Br. p. 15–16 (internal citations omitted). South Central's failure to "tak[e] advantage of the protections of Regulation CC is another breach of ordinary care," according to Lynnville, because "South Central had the right to protect itself but chose not to do so." Appellee's Br. p. 18.

South Central, on the other hand, notes that "the whole purpose of a cashier's check and Regulation CC is to speed funds availability, not slow it down." Reply Br. p. 11. We agree. As one court noted,

By adopting the Expected Funds Availability Act, *Congress intended to accelerate the availability of funds to bank depositors* and to improve the Nation's check payment system. Towards this end, the Act confers upon the Federal Reserve Board of Governors ... broad authority to develop and adopt procedures intended to expedite the collection and return of checks.

*Parks v. Commerce Bank, N.A.,* 377 N.J.Super. 378, 872 A.2d 1116, 1120 (2005) (internal citations omitted) (emphasis added). The title of the Act is the "*Expedited* Funds Availability Act," not the "Delayed" Funds Availability Act. Thus, we agree with South Central's assertion that, in giving Landmark immediate access to the

4. 12 U.S.C. § 4001 et seq.

amount of the cashier's check, South Central was fulfilling the purposes of the Act. Reply Br. p. 12; *see also* 12 U.S.C. § 4006(c) (cautioning that no provision of the Act shall be construed as "prohibiting a depositary institution from making funds available for withdrawal in a shorter period of time than the period of time required by this chapter"); 12 C.F.R. § 229.19(c)(1) (same). Having reviewed the facts and the law, we find that South Central did not fail to mitigate its damages.

### CONCLUSION

In sum, we hold that (1) Lynnville wrongfully refused to pay the cashier's check; (2) South Central was a holder in due course of that check, meaning that Lynnville's defenses are extremely limited; (3) none of the applicable defenses are available to Lynnville; and (4) South Central did not fail to mitigate its damages. Therefore, we reverse and remand with instructions to enter final judgment in South Central's favor in the amount of the original cashier's check—$31,917.55—plus expenses, interest, and consequential damages, if any, to be determined by the trial court.

The judgment of the trial court is reversed and remanded with instructions.

NAJAM, J., and KIRSCH, J., concur.