872 A.2d 1116 (2005)
377 N.J. Super. 378
Pierre PARKS, Bayway Auto, Inc., A New Jersey Corporation, and Platinum Imports, Inc., A New Jersey Corporation, Plaintiffs-Respondents,
v.
COMMERCE BANK, N.A., Fleet Bank and Wachovia Bank, N.A., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 2005.
Decided May 18, 2005.
*1117 Jonathan O. Bauer argued the cause for appellants (Anderson Kill & Olick, attorneys; Mr. Bauer, on the brief).
Bonnie J. Mota, Verona, argued the cause for respondents (The Margolis Law Firm, attorneys; Martin G. Margolis, Ms. Mota and Lawrence D. Weinberg, admitted pro hac vice, on the brief).
Before Judges LEFELT, ALLEY and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
In this appeal,[1] we are called upon to decide whether a bank may stop payment *1118 on a cashier's check or reverse a wire transfer against the wishes of its customer. The bank's actions were prompted by the insufficiency of funds in the customer's account, which was discovered by the bank after the issuance of the certified instruments. This is an issue of first impression in this State. The question comes before us by way of appeal by defendants Commerce Bank, N.A., Fleet Bank and Wachovia Bank, N.A., from the order of the Chancery Division, General Equity Part, enjoining them from dishonoring cashier's checks and wire transfers totaling $384,597.
After considering the record and relevant sources of law, we hold that, under the circumstances depicted, a bank does not have the legal authority to unilaterally stop payment on a cashier's check or wire transfer. Because a cashier's check carries the imprimatur of the financial institution that issues it, this instrument is viewed in the commercial marketplace as the functional equivalent of cash. The public also perceives wire transfers as electronic conveyers of cash, making funds disbursed in this fashion immediately available to their intended recipient. As our modern system of commerce becomes ever more dependent upon electronic transactions, we consider the preservation of the public's confidence in these types of financial instruments to be the overarching public policy principle guiding our review of this matter. This public policy is clearly reflected in the federal regulations discussed here.

I
These are the salient facts. Plaintiffs Bayway Auto, Inc. (Bayway) and Platinum Imports, Inc. (Platinum) are New Jersey corporations. Pierre Parks is the president and chief executive officer of both companies. Bayway is in the business of selling used motor vehicles. Platinum provided consulting services to individuals wishing to import motor vehicles from Europe. Parks testified that, due to customs restrictions, Platinum has been dormant for over two years. Parks owned Bayway with Anatoly Rybner but severed his business relationship with Rybner in December 2003, buying out his interest in the business. At the time this matter came before the trial court, Rybner was the sole owner of Good Guys Auto Sales (Good Guys).
At oral argument, we requested that the parties confer and stipulate to the chain of events that led to this litigation. The following transactional chart reflects this stipulation:
The Bank Accounts

Paragon Account: refers to an account maintained by Good Guys with Paragon Federal Credit Union.

First Good Guys Commerce Account: refers to an account opened by Good Guys at Commerce Bank, N.A., Sheepshead Bay, New York branch on or about October 30, 2003.

First Bayway Commerce Account: refers to an account opened by Bayway at Commerce Bank's Woodbridge, New Jersey branch on or about November 4, 2003.

Second Bayway Commerce Account: refers to an account opened by Bayway at Commerce Bank's Woodbridge, New Jersey branch on or about December 2, 2003.

Fleet Account: refers to a checking account opened by Platinum in New Jersey at Fleet bank, or its predecessors (if any), prior to 2000.

Wachovia Account: refers to a savings account opened by Parks in New Jersey at Wachovia Bank, or its predecessors, in approximately 1998 or 1999.

*1119 Transactions by Rybner

From Paragon to First Good Guys Commerce
On or about December 19, 2003, Rybner deposited a check drawn on the Paragon Account in the amount of $27,500 into the First Good Guys Commerce Account.
On or about December 22, 2003, Rybner deposited checks in the following amounts drawn on the Paragon Account into the First Good Guys Commerce Account:
(a) $85,000
(b) $92,000
(c) $78,500
(d) $73,000
(e) $49,500
(f) $47,200.
On or about December 23, 2003, Rybner deposited checks in the following amounts drawn on the Paragon Account into the First Good Guys Commerce Account:
(a) $325,000
(b) $372,000.
There were insufficient funds in the Paragon Account to cover the checks set forth in the transactions that occurred on December 22 and December 23, 2003.
From First Good Guys Commerce to First Bayway Commerce
On or about December 22, 2003, Rybner deposited a check drawn on the First Good Guys Commerce Account in the amount of $34,000 into the First Bayway Commerce Account.
On or about December 23, 2003, Rybner deposited a check drawn on the First Good Guys Commerce Account in the amount of $100,000 into the First Bayway Commerce Account.
On or about December 26, 2003, Rybner deposited checks in the following amounts drawn on the First Good Guys Commerce Account into the First Bayway Commerce Account:
(a) $47,500
(b) $72,500
(c) $85,000
(d) $85,000.
There were insufficient funds in the First Good Guys Commerce Account to cover the checks set forth.

Transactions by Parks
During the period between December 23 and 31, 2003, Parks made a number of deposits into the Second Bayway Commerce Account consisting of cash, a cashier's check and third party checks. They totaled $93,535.64. These deposits were all unrelated to the Rybner transactions, and were all honored.
During this same time period, Parks withdrew from the First Bayway Commerce Account and the Second Bayway Commerce Account a total of $84,345. On December 23, 2003, Parks obtained a cashier's check in the amount of $27,995, payable to N.A.D.E., an auto auctioneer, using funds from the First and Second Bayway Commerce Accounts; and a cashier's check in the amount of $123,340 payable to Manheim Auto Auction using funds from the First Bayway Commerce Account.[2]
Thereafter, Parks engaged in a series of transactions that, in the interest of clarity, we list in chronological order:
1) On December 24, 2003, Parks transferred, via the Internet, $100,000 from the First Bayway Commerce Account to the Second Bayway Commerce Account.

*1120 2) On December 26, 2003, Commerce Bank, at Parks's request, wire-transferred $167,000 from the Second Bayway Commerce Account to the Fleet Account.
3) On December 29, 2003, Parks obtained a cashier's check in the amount of $7,500 payable to C.A.B.A.C. (Bayway's landlord) using funds from the First Bayway Commerce Account.
4) On December 29, 2003, Commerce Bank, at Parks's request, wire-transferred $58,900 from the Second Bayway Commerce Account to the Fleet Account.
5) On December 30, 2003, Parks transferred, via the Internet, $50,000 from the First Bayway Commerce Account to the Second Bayway Commerce Account.
6) On December 30, 2003, Parks obtained a cashier's check in the amount of $50,000 made payable to Parks using funds from the Fleet Account. Parks then deposited this cashier's check into the Wachovia Account.
7) On December 31, 2003, Parks obtained a cashier's check in the amount of $50,000 made payable to Anthony L. Adams using funds from the Fleet Account.
8) On December 31, 2003, Parks obtained a cashier's check in the amount of $40,000 made payable to Michael Marro using funds from the Fleet Account.
9) On December 31, 2003, Parks obtained a cashier's check in the amount of $67,000 made payable to Parks using funds from the Fleet Account.
On or about December 30, 2003, Commerce discovered that the checks issued by Rybner to Parks, and thereafter deposited by Parks at the above mentioned Commerce accounts, were dishonored and returned unpaid, based on insufficient funds. Because the various wire transfers and cashier's checks issued were based on Rybner's now dishonored checks, Commerce issued a stop payment order, and asked the other banks in the chain of distribution to withhold the release of these funds. In exchange for agreeing to this action, Commerce offered Fleet and Wachovia indemnification against any claims brought by any affected party.

II
On January 13, 2004, plaintiffs filed an Order to Show Cause seeking a mandatory injunction compelling defendants to honor the instruments in question. At first, the trial court denied plaintiffs' request for a preliminary injunction and scheduled a plenary hearing. After hearing from a number of witnesses, the court concluded that defendants lacked the legal authority to stop payment on the certified checks and wire transfers. The court enjoined defendants from dishonoring these instruments.
By adopting the Expedited Funds Availability Act, 12 U.S.C.A. § 4001 to § 4010, Congress intended "to accelerate the availability of funds to bank depositors and to improve the Nation's check payment system." Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 266, 116 S.Ct. 637, 133 L. Ed.2d 635, 639 (1996). Toward this end, the Act confers upon the Federal Reserve Board of Governors (FRBG) broad authority to develop and adopt procedures intended to expedite the collection and return of checks. Farm Credit Servs. v. Am. State Bank, 339 F.3d 764, 767-68 (8th Cir.2003).
12 C.F.R. § 229.12(b) requires a depository bank to make funds deposited in an account in the form of a local check available for withdrawal by the customer, not later than the second business day following the banking day on which funds are deposited. This requirement contains three specifically enumerated exceptions. Two of those exceptions are not relevant here; the third is. It reads as follows:

*1121 Time period adjustment for withdrawal by cash or similar means. A depositary bank may extend by one business day the time that funds deposited in an account by one or more checks subject to paragraphs (b), (c), or (f) of this section are available for withdrawal by cash or similar means. Similar means include electronic payment,[3] issuance of a cashier's[4] or teller's check, or certification of a check, or other irrevocable commitment to pay, but do not include the granting of credit to a bank, a Federal Reserve Bank, or a Federal Home Loan Bank that presents a check to the depositary bank for payment. A depositary bank shall, however, make $400 of these funds available for withdrawal by cash or similar means not later than 5:00 p.m. on the business day on which the funds are available under paragraphs (b) ...
[12 C.F.R. § 229.12(d) (emphasis added).]
This regulatory scheme recognizes the irrevocable characteristics of both a "cashier's check" and other forms of electronic payments such as "wire transfers." Because the FRBG defined these instruments in terms of their similarities to cash, it is entirely reasonable for the marketplace to treat them as the functional equivalents to cash.
Even before the proliferation of electronic commerce and the promulgation of the FRBG's regulations, the courts of this State recognized the unique characteristics of cashier's checks. In Nat'l Newark & Essex Bank v. Giordano, 111 N.J.Super. 347, 350, 268 A.2d 327 (Law Div.1970), Judge Sugrue explained that "when a bank issues a cashier's check it becomes primarily obligated to pay the amount represented upon presentation." Thus, insufficiency of funds in the customer's account in no way diminishes the bank's primary obligation to honor the instrument when presented for payment, because the funds supporting the cashier's check come from the bank itself. See also Santos v. First Nat'l State Bank of New Jersey, 186 N.J.Super. 52, 64, 451 A.2d 401 (App. Div. 1982); Bruno v. Collective Fed. Sav. and Loan Ass'n, 147 N.J.Super. 115, 122 n. 2, 370 A.2d 874 (App.Div.1977).
A bank's legal obligation to honor a cashier's check "or other draft" drawn on the bank's funds, such as a wire transfer, is also clearly set out in the Uniform Commercial Code:
The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder, or if the issuer signed an incomplete instrument, according to its terms when completed, to the extent stated in [N.J.S.A.] 12A:3-115 and [N.J.S.A.] 12A:3-407. The obligation is owed to a person entitled to enforce the instrument or to an indorser who paid the instrument under [N.J.S.A.] 12A:3-415.

*1122 [N.J.S.A. 12A:3-412.]
Defendants argue that Commerce had the legal authority to stop payment on the cashier's checks and wire transfers at issue here because 12 C.F.R. § 229.19(c)(iii) confers upon a bank the right "to charge back funds made available to its customer for an electronic payment for which the bank has not received payment in actually and finally collected funds." Defendants' reliance on this federal regulation is misplaced.
The "charge back" provisions in § 229.19(c)(iii) relied upon by defendants are simply irrelevant to the issues raised here. This regulation merely authorizes Commerce to recoup funds lost in connection with the release of uncollected funds, by "charging back" or debiting its customer's account. Section 229.19(c)(iii) does not authorize the bank to renege on its primary obligation by stopping payment on cashier's checks or wire transfers.
In rendering his oral decision in favor of granting plaintiffs' application for injunctive relief, Judge Messina gave the following succinct and correct analysis of the issue:
What happened here was for reasons of its own, Commerce issued cashier checks against uncollected funds and also arranged for wire transfers against uncollected funds. Now, perhaps, this was an accommodation to customers, it may have been in accordance with the policy that was established in order to please customers[.] I don't know and the reason really doesn't matter. But when Commerce issued the official cashier's check, Commerce assumed the obligations set forth in [N.J.S.A.] 12A:3-412. The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument according to its terms at the time it was issued[.] [A]nd then it goes on. The bank, Commerce, was a maker of this obligation. The comment to the code does refer to the fact that the drawer is liable as a maker.
Now once the bank issues an official cashier's check, then the bank is not merely acting as a drawee or a depositary for somebody else's money, the bank ... is making an affirmative commitment to pledge its own assets with regard to the payment of the item.
We review the trial court's grant of injunctive relief here based on the four-part test articulated by the Supreme Court in Crowe v. DeGioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982). That is, injunctive relief should issue only when: (1) necessary to prevent irreparable harm; (2) the legal rights underlying plaintiff's claims are settled; (3) the material facts are uncontroverted; and (4) a relative hardship analysis favors the party requesting relief. We are satisfied that the trial court correctly applied these standards in issuing the preliminary injunction precluding defendants from dishonoring the cashier's checks and wire transfers.
First, as Judge Messina found, there is no question that plaintiffs will suffer irreparable harm. The transactions involved here were a part of ongoing commercial activities customarily carried on by Bayway as essential parts of its business model. Permitting Commerce to dishonor these instruments would significantly undermine the business's economic relationships. Such a loss is not susceptible to monetary quantification.
In assessing irreparable harm, we must also consider how defendants' actions affect the public interest. Anyone who has ever used a computer to pay a bill, transfer funds, or ascertain the status of a deposit, can attest that electronic banking is now a standard, routine part of the services offered by today's banks. Indeed, the thrust of the regulations promulgated *1123 by the FRBG pursuant to the Expedited Funds Availability Act reflect a clear preoccupation with regulating this aspect of modern banking. Enjoining Commerce from dishonoring the cashier's checks and wire transfers at issue here advances the public interest embodied in these federal regulations. See Cmty. Hosp. Group, Inc. v. More, 183 N.J. 36, 62, 869 A.2d 884 (2005).
The balance of the Crowe factors clearly favor plaintiffs' case as well. Judge Messina correctly addressed the legal issues. The material facts are undisputed, and the relative hardship occasioned by the injunction, if any, is best borne by defendants.
Affirmed and remanded for such further proceedings as may be required.
NOTES
[1] This is an interlocutory review. The issues here come before us by leave granted.
[2] Commerce Bank entered into settlement agreements with both N.A.D.E. and Manheim Auto Auction, ending their conflicting claims regarding these cashier's checks.
[3] 12 C.F.R. § 229.2(ll) defines "wire transfer" as: "an unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt or on a day stated in the order, that is transmitted by electronic or other means through Fedwire, the Clearing House Interbank Payments System, other similar network, between banks, or on the books of a bank. Wire transfer does not include an electronic fund transfer as defined in section 903(6) of the Electronic Fund Transfer Act (15 U.S.C. 1693a(6))."
[4] 12 C.F.R. § 229.2(i) defines a "cashier's check" as a check that is: "(1) [d]rawn on a bank; (2)[s]igned by an officer or employee of the bank on behalf of the bank as drawer; (3)[a] direct obligation of the bank; and (4)[p]rovided to a customer of the bank or acquired from the bank for remittance purposes."