NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0897-12T1

GLOBE MOTOR COMPANY, a corporation
of the State of New Jersey, and
THE MARGOLIS LAW FIRM, LLC,

     Plaintiffs-Respondents,

v.

ILYA IGDALEV and JULIA IGDALEV,

     Defendants-Appellants.

_____

| |
| --- |
| **APPROVED FOR PUBLICATION** |
| **August 7, 2014** |
| **APPELLATE DIVISION** |

Argued December 11, 2013 – Decided August 7, 2014

Before Judges Sapp-Peterson, Lihotz and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8638-11.

Christopher J. Koller argued the cause for appellants.

Sara A. Kimball argued the cause for respondents (The Margolis Law Firm LLC, attorneys; Ms. Kimball, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

Defendants, Ilya and Julia Igdalev,[1] appeal from a May 11, 2012 order denying their motion for summary judgment and a separate order entered the same day granting summary judgment in favor of plaintiffs Globe Motor Company (Globe) and The Margolis Law Firm (Margolis). Defendants further appeal from the final judgment filed on September 12, 2012, awarding plaintiffs damages of $42,381, which included an award of attorney's fees. On appeal, defendants raise several arguments maintaining entry of summary judgment was erroneous. We disagree and affirm.

These are the facts viewed most favorably toward defendants. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529—30 (1995). Plaintiffs filed a declaratory judgment action (BER-L-8638-11) seeking a determination that defendants were responsible to pay various costs and expenses resulting from defendants' failure to comply with the terms of the parties' settlement agreement (Globe II). Prior to addressing the issues presented, we must provide background information regarding the settlement in the underlying action and events supporting plaintiffs' declaratory judgment complaint.

The underlying action (BER-C-203-08) was initiated by Globe, as represented by Margolis, which alleged breach of

_____

[1] To avoid confusion, when referring to each individual defendant, we use his or her first name.

contract and fraud against defendants and two others (Globe I). That action was settled by a six-page written settlement agreement. Among the terms of settlement was paragraph 2, which stated:

> That ILYA and JULIA shall jointly pay to GLOBE the amount of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, by certified or attorney trust account check payable to "The Margolis Law Firm LLC, as attorneys for Globe Motor Company" and delivered to The Margolis Law Firm LLC not later than 1:00pm on Friday, October 2, 2009 *TIME BEING EXPRESSLY MADE OF THE ESSENCE*.

The settlement agreement also provided that "[i]n the event ILYA does not pay, for any reason or no reason, any portion of the settlement amount, then in such event, JULIA shall pay the entire SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS of the settlement amount, as required by the provisions of paragraph #2 hereof." Upon "full payment" plaintiffs would enter a stipulation dismissing the litigation and the agreement contained a full mutual release of claims between the parties.

By October 2009, Margolis received two certified bank checks totaling $75,000. More specifically, one check was for $12,000 and the other for $63,000, each made payable to "The Margolis Law Firm, LLC as Attorneys for Globe Motor Company." The larger check contained a notation stating: "Remitter Mike Povolotsky."

Margolis accepted the certified checks as defendants' payment under the terms of the settlement agreement. A stipulation of dismissal, with prejudice, was later filed concluding Globe I.

Almost one year later, Globe and Margolis were served with a complaint filed by Brian Leonard, the designated Chapter 7 Trustee assigned to supervise the bankruptcy case initiated by the debtor Auto Point, Limited (Auto Point).[2] Leonard, on behalf of the debtor's estate, filed an adversary proceeding to recover $75,000 alleged to have been fraudulently transferred from the debtor's assets and paid to Margolis and Globe. Leonard asserted Auto Point "was not a client of, and owed no obligations to" Margolis or Globe, and the debtor had "received less than a reasonably equivalent value in exchange for the [t]ransfers." Furthermore, Leonard's complaint maintained the transfers were made when Auto Point was insolvent or the debtor became insolvent as a result of the transfers. Leonard alleged the transfers were voidable under various provisions of the Bankruptcy Code.

Plaintiffs learned Povolotsky, defendants' friend and business associate, owned Auto Point. The trustee had

_____

[2] Auto Point filed its voluntary petition pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota on April 23, 2010.

determined the monies transmitted to Margolis to satisfy defendants' obligations under the settlement agreement were taken from Auto Point's funds.

Margolis and Globe hired separate bankruptcy counsel. A settlement resolving Leonard's claims was reached, requiring payment of $22,500. Additionally, they incurred attorney's fees and costs.

When the bankruptcy action was terminated, plaintiffs filed Globe II, seeking to recover damages sustained in defending and settling the adversary proceeding. Plaintiffs alleged defendants had breached the terms of settlement in the underlying action by "fail[ing] to tender the amount due under the Settlement free and clear from claims of others and not subject to surrender . . . ." Plaintiffs alleged defendants' breach caused plaintiffs to suffer damages equivalent to the amounts paid to Leonard to settle the trustee's claims, along with attendant attorney's fees and costs, both in the bankruptcy action and the declaratory judgment matter. The Globe II complaint also alleged unjust enrichment, breach of the covenant of good faith and fair dealing, fraud, and also sought indemnification from Julia.

The parties filed cross-motions for summary judgment. Plaintiffs' counsel restated the facts regarding the Globe I

litigation, settlement agreement, checks received, Minnesota bankruptcy proceedings, terms of settlement of the adversary proceeding, and attorney's fee expense incurred. Globe's vice president affirmed these facts.

In support of defendants' motion for summary judgment, Ilya certified:

> 4. In order to resolve that litigation, I entered into a Settlement Agreement, wherein Globe was to receive $75,000.00, payable to The Margolis Law Firm LLC, as Attorneys for Globe Motor Company.
>
> 5. This settlement was made as a business decision by all parties.
>
> 6. Pursuant to the Settlement Agreement and Release, I was to pay the sum of $75,000.00 and my former wife, Julia Igdalev, was a guarantor of said payment and in addition, entered into a confession of judgment if those payments were not made.
>
> 7. At approximately the same time the Settlement Agreement was executed, my New Jersey bank accounts had been restrained due to allegations in a criminal action against me.
>
> 8. Prior to the restraint of my funds, in the New Jersey bank accounts, I had a business and personal relationship with an individual named Michael Povolotsky.
>
> 9. Michael Povolotsky was a buyer and seller of cars in Minnesota, and also operated a business in Minnesota called "Auto Point Limited."
>
> 10. About the same time the Settlement Agreement was reached, Michael Povolotsky,

individually, was holding more than $75,000.00 of money owed to me from prior dealings.

11. I requested Michael Povolotsky to make checks payable to The Margolis Law Firm LLC, in the total amount of $75,000.00 in settlement of this case.

Ilya averred neither he nor Julia "were asked, nor agreed to indemnify or hold [plaintiffs] harmless from any claims[,]" stating "[t]here was absolutely no provision in the Settlement Agreement . . . that the funds were to come from my wife or myself, individually, or [from] any specific payor." Maintaining he acted "in good faith," Ilya insisted he made the payment required under the settlement agreement, and based on the release, neither he nor Julia had a further obligation to plaintiffs.

Julia too filed a certification adopting as true and correct all statements made by Ilya. "In addition, [she noted] all payments were timely made and accepted without protest by [p]laintiff[s], who had dismissed the . . . action with prejudice."

Following a lengthy oral argument, the Law Division judge denied defendants' and granted plaintiffs' motion for summary judgment. The judge found defendants had materially breached the settlement agreement because the monies tendered were determined to have been transferred from the debtor Auto Point,

7

without consideration, and were legally subject to recovery. The judge therefore concluded Ilya did not pay the $75,000 as required by the settlement agreement. He entered orders memorializing this decision on May 11, 2012. Subsequent motions were filed regarding recovery of attorney's fees and costs. Final judgment was entered on September 12, 2012. Defendants' appeal ensued.

We review the trial court's summary judgment order de novo, applying the same standard that governs the trial court. W.J.A. v. D.A., 210 N.J. 229, 237 (2012); Lapidoth v. Telcordia Tech., Inc., 420 N.J. Super. 411, 417 (App. Div.), certif. denied, 208 N.J. 600 (2011). Pursuant to Rule 4:46, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540. "[W]hen the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Ibid. (citation and internal quotation marks omitted). If no genuine factual dispute exists, we must decide whether the trial court's ruling on the law, to which we owe no deference, was correct. W.J.A., supra, 210 N.J. at 237-38.

Also implicated in our review are principles governing the enforcement of the parties' terms of settlement. "Public policy favors the settlement of disputes. Settlement spares the parties the risk of an adverse outcome and the time and expense -- both monetary and emotional -- of protracted litigation." Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 253-54 (2013). See also Herrera v. Twp. of S. Orange Vill., 270 N.J. Super. 417, 424 (App. Div. 1993) (noting "[t]here is a clear public policy in this state favoring settlement of litigation"), certif. denied, 136 N.J. 28 (1994). "Settlements avert the risks of litigation, spare the parties ruinous litigation expenses, and conserve judicial resources." Pinto v. Spectrum Chems. & Lab. Prods., 200 N.J. 580, 594 (2010). Moreover, settlements permit "litigants to resolve disputes on mutually acceptable terms in place of risking exposure to an adverse judgment[.]" DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 259 (2009) (citation omitted). "A defendant's likely settlement calculation is whether the payout is less than the 'cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation.'" Pinto, supra, 200 N.J. at 594 (quoting Evans v. Jeff D., 475 U.S. 717, 734, 106 S. Ct. 1531, 1541, 89 L. Ed. 2d 747, 762 (1986)).

"'An agreement to settle a lawsuit is a contract, which like all contracts, may be freely entered into and which a court, absent a demonstration of fraud or other compelling circumstances, should honor and enforce as it does other contracts.'" Brundage v. Estate of Carambio, 195 N.J. 575, 601 (2008) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div.), certif denied, 94 N.J. 600 (1983)). The "[i]nterpretation of a settlement agreement implicates significant legal and policy principles[.]" Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009). Our review of legal questions is plenary. Zabilowicz v. Kelsey, 200 N.J. 507, 512 (2009).

When examining the terms of a settlement agreement, we are guided by the rules of contract construction. Brundage, supra, 195 N.J. at 601. See also Thompson v. City of Atl. City, 190 N.J. 359, 379 (2007). "The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 492 (App. Div.), certif. denied, 127 N.J. 548 (1991). In interpreting a contract, the focus is on "the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the

attendant circumstances, and the objects they were thereby striving to attain . . . ." Lederman v. Prudential Life Ins. Co. of Am., Inc., 385 N.J. Super. 324, 339 (App. Div.) (citation and internal quotation marks omitted), certif. denied, 188 N.J. 353 (2006). In that regard, the court may not re-write a contract or grant a better deal than that for which the parties expressly bargained. Solondz v. Kornmehl, 317 N.J. Super. 16, 21 (App. Div. 1998).

Recognizing the parties' autonomy in resolving their disputes, "[i]t follows that any action which would have the effect of vitiating the provisions of a particular settlement agreement and the concomitant effect of undermining public confidence in the settlement process in general, should not be countenanced." Dep't. of Pub. Advocate, Div. of Rate Counsel v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985). With these principles in mind, we consider defendants' arguments.

On appeal, defendants contend the judge incorrectly granted summary judgment to plaintiffs, asserting the only "competent evidential material[]" before the court was Ilya's certification stating the $75,000 transferred by Povolotsky was Ilya's money. Therefore, the funds could not belong to the debtor, Auto Point. Because defendants challenged plaintiffs' claim regarding the

ownership of the money used to satisfy the obligations under the settlement agreement, defendants argue material factual disputes obviated entry of summary judgment.

To support this contention, defendants claim "all parties were aware of the restraint on Ilya['s] . . . funds in Bergen County." Defendants' brief purports to quote from Ilya's certification filed in support of defendants' motion and in opposition to plaintiffs' motion for summary judgment. However, the certification as filed contains no statement placing plaintiffs on notice of the restraint of defendants' funds or the need to rely on Povolotsky. In fact, the recitals recounted and relied on by defendants' in their brief materially differ from the actual facts of record.

Nevertheless, accepting as true Ilya's statement Povolotsky was "holding . . . money owed . . . from prior dealings" does not prove funds sent to plaintiffs by Povolotsky were Ilya's or refute that the money transferred to plaintiffs actually belonged to Auto Point. Defendants' contrary suggestion made to create a dispute of material facts is illusory. See Shelcusky v. Garjulio, 172 N.J. 185, 200-01 (2002) ("The very object of the summary judgment procedure then is to separate real issues from issues about which there is no serious dispute."). Quite

simply, the assertion that Povolotsky held Ilya's money does not mean he sent Ilya's money.[3]

Also, defendants mistakenly contend that absent a judgment from the Bankruptcy Court determining the funds actually were Auto Point's must mean they were Ilya's funds in Povolotsky's possession. That Povolotsky held Ilya's money creates no dispute of a material fact, which should subject plaintiffs to the burden of a trial. Merely because Povolotsky held Ilya's money does not establish he used those funds when making payment to plaintiffs. Indeed, Ilya asserts no personal knowledge establishing his money was actually transferred; at its best, defendants' suggestion in this regard is merely supposition, which is insufficient to defeat summary judgment.

The record, viewed most favorable to defendants, shows only that after Ilya asked his friend and business associate to satisfy the settlement obligation with money owed to him, Povolotsky did so using assets of his company, Auto Point. Ilya does not maintain Auto Point owed him money.

_____

[3] Our dissenting colleague maintains it is reasonable to "infer . . . that the funds Povolotsky used to buy the checks were those owed to Ilya." Post at ___ (slip op. at 7). We cannot abide by such a conclusion. Auto Point was a corporation. As such, it is an independent legal entity. Thus, if Povolotsky owed Ilya money, payment could not reasonably or permissibly come from Auto Point's funds. Importantly, Ilya never asserts Auto Point owed him money, as the dissent assumes. Post at ___ (slip op. at 7).

A-0897-12T1

Auto Point's ownership of the funds is evident from the bankruptcy pleadings. Leonard is a fiduciary appointed by the United States Bankruptcy Court to oversee the debtor's estate. See 11 U.S.C.A. § 321 to § 323 (stating eligibility and general duty of bankruptcy trustee). After examining the debtor's books and records, Leonard filed the adversary proceeding to recover money he found was taken from Auto Point's account and transferred to plaintiffs. There is no dispute regarding the amount transferred, which matched the sums delivered to plaintiffs or that the checks as issued were made payable to Margolis as attorney for Globe. Further, there is no evidence Auto Point owed a debt or obligation to plaintiffs or Ilya. Because the transfer was without consideration, it is subject to recovery. See 11 U.S.C.A. § 548 (allowing trustee to avoid fraudulent transfers made by a debtor within the four-year limitations period). The settlement of the adversary action represented a compromise by the parties with respect to the contested and disputed issues, accepting the trustee's evidence, along with each side's assessment of the cost and expense in proceeding to trial.[4]

---

[4] The dissent suggests the judge improperly faulted defendants for their "fail[ure] to participate in [the bankruptcy action] to which they had never been made a party." Post at ___ (slip op. at 9). We provide only these brief
(continued)

14                                                    A-0897-12T1

We conclude plaintiffs cannot be faulted for settling rather than trying the adversary proceeding. See <u>Frank Stamato & Co. v. Lodi</u>, 4 <u>N.J.</u> 14, 21 (1950) (citing <u>Ramsey v. Perth Amboy Shipbuilding Eng'g Co.</u>, 72 <u>N.J. Eq.</u> 165 (Ch. 1906), <u>aff'd.</u> 73 <u>N.J. Eq.</u> 742 (E. & A. 1908)). ("[I]t is well established that a party who has been injured by a breach of contract must make reasonable efforts to mitigate his damages[.]").  To suggest

---

(continued)
comments.  Joinder implicates establishment of subject matter jurisdiction, which is grounded in and limited by statute. <u>Celotex Corp. v. Edwards</u>, 514 <u>U.S.</u> 300, 307, 115 <u>S. Ct.</u> 1493, 1498, 131 <u>L. Ed.</u> 2d 403, 410 (1995).  Pursuant to 28 <u>U.S.C.A.</u> § 157(b)(1), bankruptcy judges hear all core proceedings and "may enter final orders and judgments with respect to such proceedings."  <u>In re J.T. Moran Fin. Corp.</u>, 124 <u>B.R.</u> 931, 936 (Bankr. S.D.N.Y. 1991).  Core proceedings are those "arising under Title 11 or arising in or related to a case under  Title 11[.]"  <u>Phar-Mor, Inc. v. Coopers & Lybrand</u>, 22 <u>F.</u>3d 1228, 1234 n.9 (3d Cir. 1994).  <u>See also</u> 28 <u>U.S.C.A.</u>      § 157(b)(2) (providing a non-exhaustive list of core proceedings).  "By contrast, proceedings which are 'related to' a bankruptcy case are non-core."  <u>Id.</u> at 1235.  "In non-core proceedings, unless the parties consent to the bankruptcy court's jurisdiction, the bankruptcy judge has the power only to 'submit proposed findings of fact and conclusions of law to the district court,' and the parties are entitled to de novo review of any matter to which they 'timely and specifically' object."  <u>In re Arnold Print Works, Inc.</u>, 815 <u>F.</u>2d 165, 167 (1st Cir. 1987) (quoting 28 <u>U.S.C.A.</u> § 157(c)(1)).  Jurisdiction over a non-core matter is permissible only if "<u>the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy[.]</u>"  <u>Celotex Corp.</u>, <u>supra</u>, 514 <u>U.S.</u> at 308, 115 <u>S. Ct.</u> at 1499, 131 <u>L. Ed.</u> 2d at 411 n.6.  Here, plaintiffs' action to enforce the settlement agreement had no impact on the estate. Further, as we noted, Ilya's suggestion that Povolotsky held his funds would not defeat the trustee's position that funds were transferred from Auto Point and paid to plaintiffs.

plaintiffs were required to complete a trial and obtain a judicial determination is specious. <u>Pinto</u>, <u>supra</u>, 200 <u>N.J.</u> at 594.

We additionally reject defendants' argument suggesting the motion judge's determination was erroneously based on his finding Ilya was not credible. The judge's cited comments were not a determination of contested facts; rather, the statements represent an assessment that the asserted facts do not create a material dispute. As the Court held in <u>Shelcusky</u>:

> The determination that an offsetting affidavit creates only a sham factual dispute is squarely within the trial court's authority at the summary judgment stage, when the court is required to evaluate, analyze, and sift evidence to determine whether the evidential materials, when viewed in the light most favorable to the opposing party, would permit a rational factfinder to resolve the issue in favor of the opposing party. That rule does not intrude on the function of the jury because it does not require the trial court to determine credibility, or to determine the relative weight of conflicting evidence. We are confident that trial courts have the ability to distinguish sham affidavits from affidavits that raise a genuine issue of material fact.
>
> [<u>Shelcusky</u>, <u>supra</u>, 172 <u>N.J.</u> at 201.]

Defendants next assert they fully complied with the settlement terms as drafted and were innocent because they lacked knowledge of any wrongdoing by their friend Povolotsky.

Essentially, defendants believe their presentation of certified checks that were accepted by plaintiffs, who thereafter filed a full release and stipulation of dismissal, ends our inquiry. Additionally, defendants argue plaintiffs could have rejected the tender of the funds drawn on a Minnesota Bank or after noticing one check contained Povolotsky's name as remitter. We examine these points.[5]

Evaluating the relative innocence of the parties, when deciding who bears the burden of Povolotsky's actions, we conclude the manner and methods chosen were controlled by defendants and accomplished at their direction. Therefore, the consequences of Povolotsky's unseemly conduct falls to them rather than plaintiffs. Povolotsky's failure equates to defendants' failure to perform and strikes at the very heart of the settlement agreement, defeating its purpose and representing a material breach of its terms. See Restatement (Second) Contracts § 241 comment a (1981) (discussing a material breach of contract).

Defendants' contention that they complied with the letter of the settlement agreement when they tendered a cashier's and a

_____

[5] Defendants also argue the judge erred because the settlement agreement did not contain a specific term that, if Ilya did not pay, a judgment would be entered against him. This argument lacks merit. R. 2:11-3(e)(1)(E).

bank check totaling $75,000 is legally unfounded. An essential element of the agreement was that plaintiffs received the agreed-upon amount. Because legal claims attached to the money tendered, which were not immediately apparent, payment was illusory.

The constrained construction of the contractual obligations asserted by defendants completely ignores the reality that legal defenses attached to the funds, which prevented plaintiffs' retention. By accepting the compromise set forth in the settlement agreement, plaintiffs sought to end the litigation with defendants and had no intention of becoming embroiled in a new suit. When the monies used to satisfy defendants' obligation were not free of the claims of others, the essence of the settlement agreement was breached. Although Ilya delivered payment, the funds used did not belong to Povolotsky and could not be transferred to another. Therefore, the trustee's recovery of $22,500 results in defendants not paying plaintiffs the agreed sum of $75,000.

We also find defendants' argument that plaintiffs should have been suspect of the out-of-state checks highly disingenuous. After all, defendants commissioned Povolotsky to act. Plaintiffs had no reason to doubt the efficacy of the negotiable instruments, N.J.S.A. 12A:3-104(c), or know the money

tendered actually belonged to Auto Point. The mode of payment specified in the settlement agreement was intended to provide some security that receipt of the designated instruments evidenced existence of the funds. See Merchants' Nat'l Bank v. State Bank, 77 U.S. 604, 648 (10 Wall.), 19 L. Ed. 1008, 1019 (1870) (acknowledging "[t]he practice of certifying checks has grown out of the business needs of the country," and noting "[t]hey enable the holder to keep or convey the amount specified with safety. They enable persons not well acquainted to deal promptly with each other, and they avoid the delay and risks of receiving, counting, and passing from hand to hand large sums of money."). Defendants' provision of a cashier's check and a bank check, paid to the order of plaintiffs, reflected monies drawn on the banks' funds, again a mode implying security of the payment. N.J.S.A. 12A:3-104(g). However, even a cashier's check is not free of legal defenses. See Santos v. First Nat'l State Bank of N.J., 186 N.J. Super. 52, 63 (App. Div. 1982).[6]

---

[6] We do not agree with our dissenting colleague that cashier's checks are the functional equivalent of cash. Post at ___ (slip op. at 13). In fact, Parks v. Commerce Bank, 377 N.J. Super. 378 (App. Div. 2005), makes clear federal regulatory treatment of the speed with which banks must process these instruments makes it "reasonable for the marketplace to treat them as the functional equivalents to cash." Id. at 385. Provisions of the Uniform Commercial Code remain applicable and "it is a mistake to conclude that cashier's checks are like cash in all situations." Santos, supra, 186 N.J. Super. at 63. We
(continued)

Contrary to the inference sought by defendants, there is no evidence plaintiffs were party to Povolotsky's actions.[7] As such, plaintiffs qualified as a holder in due course, as defined under Article 3 of the Uniform Commercial Code (UCC), codified as N.J.S.A. 12A:3-101 to -605. A "holder in due course" is a holder who takes the instrument (a) for value, (b) in good faith and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. N.J.S.A. 12A:3-302(a)(2).

Our assessment that defendants are liable under these facts (rather than suggesting plaintiffs are at fault), aligns with this concept.

> The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as

(continued)
can agree that "[u]nless otherwise agreed, if a certified check, cashier's check, or teller's check is taken for an obligation, the obligation is discharged to the same extent that discharge would result if an amount of money equal to the amount of the instrument were taken in payment of the obligation." N.J.S.A. 12A:3-310(a). However, if legal defenses defeat the payment, the obligation must be restored. This refutes our dissenting colleague's assertion that defendants complied with the settlement as a matter of law. Post at ____ (slip op. at 13).

[7] As noted above, defendants' reliance on the proposition that plaintiffs knew what Povolotsky was doing was premised on a certification that is not part of the record.

its face would indicate. It would seem to follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he [or she] controls or participates or becomes involved in it, the less he [or she] fits the role of a good faith purchaser for value; the closer his [or her] relationship to the underlying agreement which is the source of the note, the less need there is for giving him [or her] the tension-free rights considered necessary in a fast-moving, credit-extending commercial world.

[Unico v. Owen, 50 N.J. 101, 109-10 (1967).]

We also reject defendants' contention plaintiffs should have included provisions in the settlement agreement restricting payment solely from Ilya's funds, or otherwise requiring indemnification, including in the event of third-party recovery, as occurred here.[8] Any notion that settlement agreements must include language to curb all possible sharp or illicit practices is antagonistic to one's obligation to negotiate in good faith. Perhaps it was unforeseen that Povolotsky would be a scoundrel, but we cannot ignore Ilya controlled that process. Therefore,

---

[8] We understand the dissent finds the absence of such provisions compelling. Post at ____ (slip op. at 12-14). We disagree because the practical application of requiring the enumeration of all provisions that could defeat the apparent obligation of payment would be burdensome as impractical and, thus, discourage settlement arrangements. We also cannot accept that when weighing the responsibilities presented by these facts, Margolis should have rejected the cashier's check, because it did not reflect Ilya was the remitter. Post at ____ (slip op. at 13).

he may not be relieved of the responsibility to tender full payment if the process he chose was flawed. Under the terms of the agreement, Julia was responsible if Ilya failed to pay "for any reason or no reason." Thus, she too is liable. Globe is due $22,500.[9]

We turn to defendants' challenges to the award of attorney's fees. Citing the American Rule,[10] defendants maintain the fee award was legally unsupported. We are not persuaded.

In accordance with the American Rule, generally, attorney's fees are not recoverable unless authorized by statute or recognized as available by our Court Rules. See R. 4:42-9. However, fee awards have been ordered when incurred as damages sustained by a party forced into litigation with another as a result of fraud, see Hagen v. Gallerano, 66 N.J. Super. 319, 333 (App. Div. 1961), and for third-party litigation arising because

---

[9]    We agree with our dissenting colleague that Margolis does not have a claim against defendants for breach of the settlement agreement. Post at ____ (slip op. at 9). We do not agree the payment to Leonard was differentiated between Margolis and Globe, as such an allocation of liability is not evident in the settlement terms. Nevertheless, if Margolis received money, it was for attorney's fees paid by Globe from the $75,000 recovery. Globe would remain liable for the fees recovered; therefore, defendants must repay the entirety of the sum remitted to Leonard.

[10]    The American Rule generally requires each party to bear all legal expense incurred in representation and generally precludes recovery of counsel fees from an adversary. N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 569 (1999).

of a party's breach of contract, <u>Dorofee v. Planning Bd. of Pennsauken</u>, 187 <u>N.J. Super.</u> 141, 144 (App. Div. 1982). "The award of counsel fees as traditional damages in such settings is not precluded by <u>R[ule]</u> 4:42-9." <u>Ibid.</u> (citing <u>Cohen v. Fair Lawn Dairies, Inc.</u>, 86 <u>N.J. Super.</u> 206 (App. Div. 1965), <u>aff'd</u> 44 <u>N.J.</u> 450 (1965)).

The judge found the fees incurred were necessary consequences of defendants' breach of the settlement agreement. Noting the fees incurred were causally related to defendants' breach, the judge reasoned, "defendants put you in this situation. You had no other choice [but] to do it [i.e., defend the adversary proceeding]." Counsel's certification in support of the fee request detailed the basis of all costs and expenses. The judge found the request reasonable. Following our review we cannot determine the judge misapplied his reasoned discretion. <u>Packard-Bamberger & Co. v. Collier</u>, 167 <u>N.J.</u> 427, 444 (2001).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

**SAPP-PETERSON, P.J.A.D., dissenting.**

To accept the majority's decision is to conclude the facts are so one-sided that plaintiffs were entitled to judgment as a matter of law. Their decision, however, reflects consideration of the facts in the light most favorable to plaintiffs, contrary to the appropriate standard for granting summary judgment. Brill, supra, 142 N.J. at 523. In addition, they place the burden of proof on defendants as to the ownership of the funds transferred. For the reasons that follow, I respectfully dissent.

These are the facts viewed most favorably toward defendants. Ibid. On October 1, 2009, Globe reached a settlement agreement with defendants Ilya and Julia Igdalev in an underlying dispute (Globe I), requiring that defendants jointly pay Globe $75,000 by certified or attorney trust account check payable to Margolis, Globe's counsel in that matter and co-plaintiff here, and that payment would be delivered to Margolis by October 2, 2009. The terms also provided that if Ilya failed to timely deliver the checks, Julia would have to pay the entire amount in the same manner, as guarantor. The parties agreed a stipulation of dismissal would be filed "[u]pon full payment in accordance with th[e] [a]greement."

Within days of reaching the settlement, defendants presented two cashier's checks totaling the full obligation, both made payable to Margolis on Globe's behalf. One of them explicitly named a Mike Povolotsky, rather than either of defendants, as the remitter, and the other specified no remitter. For reasons unexplained, plaintiffs did not file the stipulation of dismissal until March 23, 2010.

In April 2010, Auto Point filed a petition for Chapter 7 Bankruptcy. On February 24, 2011, sixteen months after defendants paid the $75,000 and eleven months after the stipulation of dismissal was filed, the bankruptcy trustee, Brian Leonard, filed a complaint (adversary proceeding) against plaintiffs in Minnesota bankruptcy court, claiming that Auto Point "made two payments to [Margolis and Globe] on October 1, 2009, in the amount of $12,000.00 and $63,000.00 for a total of $75,000.00. The payments were made from [Auto Point's] assets" and "Auto Point was not a client of, and owed no obligations to, The Margolis Law Firm, LLC. The Debtor did not owe any obligations to Globe Motor Company."

The bankruptcy court admitted Margolis pro hac vice, but both Margolis and Globe retained separate local counsel. Leonard reached a settlement with Globe and Margolis for $22,500, which amounted to thirty percent of the $75,000 he

originally demanded. Both Globe and Margolis also each paid $4000 in counsel fees to local Minnesota counsel.

Plaintiffs thereafter initiated the present action (Globe II) against defendants, asserting defendants breached the settlement agreement and release because the bankruptcy proceedings in Minnesota effectively negated the settlement payment, along with claims for breach of an implied covenant of good faith and fair dealing, fraud, unjust enrichment, and indemnification. Plaintiffs subsequently moved for summary judgment and defendants cross-moved for summary judgment. The court granted plaintiffs' motion and entered judgment in favor of plaintiffs for $22,000, the exact amount plaintiffs paid to resolve the adversary proceeding. The court also entered an order awarding counsel fees to plaintiffs, allocated as follows: $19,000 in counsel fees with $8,000 and $2,000 applied to the Minnesota bankruptcy action and $9,000 for prosecution of the present action.

In granting summary judgment, the motion judge found incredible Ilya's certification that the funds used to purchase the two checks belonged to or were owed to Ilya,[1] noting that

---

[1] While the majority is correct that defense counsel's quotation of that certification in his brief differs from the copy of the certification in the record, counsel may well have been quoting from a different certification filed in a related bankruptcy
(continued)

defendants never went to Minnesota to challenge the bankruptcy trustee's position that the checks were assets of the debtor. The court also found there were no genuinely disputed issues of fact as to whether defendants breached the settlement agreement. The court expressed: "They were supposed to pay $75,000. The Court finds the $75,000 wasn't paid. Start from the initial agreement. This isn't a novation. It's not an assignment. It's none of that. They guaranteed they will be paid $75,000, and they weren't paid $75,000." The present appeal followed.

Our review of a trial court's grant or denial of a motion for summary judgment is de novo. Aqurto v. Guhr, 381 N.J. Super. 519, 525 (App. Div. 2005). Under our de novo standard of review, we employ the same standard as that of the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998). Our analysis requires that we first determine whether the moving party has demonstrated there are no genuine disputes as to material facts, and then we decide "whether the motion judge's application of the law was correct." Atl. Mut. Ins. Co. v.

_____

(continued)
matter involving Auto Point that was mentioned during oral argument. Moreover, plaintiffs' counsel never disputed that plaintiffs had been aware of Ilya's financial circumstances, notwithstanding that both defense counsel and the court referenced this fact during oral argument.

Hillside Bottling Co., 387 N.J. Super. 224, 230—31 (App. Div.), certif. denied, 189 N.J. 104 (2006). In so doing, we view the evidence in the "light most favorable to the non-moving party[.]" Brill, supra, 142 N.J. at 523 (1995). Because our review of issues of law is de novo, we accord no special deference to the motion judge's legal conclusions. Zabilowicz, supra, 200 N.J. at 512. Even where, as here, both parties move for summary judgment, that relief may not be granted so long as a trial remains necessary to resolve disputed issues of material fact, O'Keeffe v. Snyder, 83 N.J. 478, 487 (1980), particularly where issues of credibility remain, D'Amato v. D'Amato, 305 N.J. Super. 109, 114-15 (App. Div. 1997).

Every theory of liability plaintiffs assert presumes the funds they had to return to the bankruptcy estate were legitimately subject to return, that is, that the transactions were legitimately avoidable — but this is only so if the funds actually belonged to Auto Point. 11 U.S.C.A. § 548(a). The majority accepts as true for purposes of summary judgment that Povolotsky was holding funds owed to Ilya, but maintains it was "evident from the bankruptcy pleadings" that the funds Povolotsky actually sent were drawn from accounts owned by Auto Point. Ante at ___ (slip op. at 13). Because Auto Point never owed Ilya any money, at least as the majority interprets Ilya's

certification, the money Povolotsky sent could not have been Ilya's and must have belonged to Auto Point. <u>Ante</u> at ___ (slip op. at 13).

However, the only evidence plaintiffs have thus far presented that the money even originated from Auto Point's accounts is an untested allegation in a complaint from another matter. The majority may treat that allegation as established fact, but neither of the checks in the record names Auto Point as the remitter, one explicitly names Povolotsky personally, and the other bears no name for the remitter. Ilya certified that Povolotsky, not Auto Point as the majority itself points out, was to send him the money. Plaintiffs may well have settled the bankruptcy matter in good faith, in light of the trustee's evidence, but they have not shared any of that evidence here, save the checks, which reveal no connection to Auto Point on their face. One may certainly reasonably infer from the bankruptcy complaint, as the majority does here, that the reason the trustee's investigation turned up these particular transactions is that the money at some point had been drawn from Auto Point's accounts. But that inference is not favorable to defendants, and it is disputed by the balance of the record.

Ilya certified that he and Povolotsky had a business relationship, that Povolotsky operated Auto Point, that

A-0897-12T1

Povolotsky "was holding more than $75,000.00 of money owed to [him] from prior dealings," and that he requested Povolotsky send the checks to Margolis. One may reasonably infer from those circumstances that the funds Povolotsky used to buy the checks were those owed to Ilya. Moreover, even if the funds were drawn from Auto Point's accounts, an unfavorable inference not permitted on summary judgment, Ilya never specified, notwithstanding the majority's assertion to the contrary, who owed him the money, only that Povolotsky was the one who was holding it. Given that Ilya claimed the money was owed from prior business dealings, it would not be unreasonable to infer that the money was owed by Auto Point, Povolotsky's business.[2] Finally, even if we draw the contrary inference, again, not one permitted on summary judgment, that the money was owed personally by Povolotsky, it would not be inconceivable that Povolotsky, whom the majority, after all, characterizes as a "scoundrel," ante at ___ (slip op. at 21), might have intermingled his own funds with those of his corporation. Of course, one could also reasonably conclude, as the majority does, that Povolotsky personally owed money to Ilya, and that

---

[2] In that case, the transfer may yet have been avoidable, 11 U.S.C.A. § 547(b)-(c), but the record is not yet sufficient to resolve that issue, and the trustee never pleaded that ground for relief.

Ilya asked him to use _that_ money to buy the checks, but that he used Auto Point's funds instead. One could even decline to credit Ilya at all and conclude that neither Povolotsky nor Auto Point ever owed him any money in the first place.

The point to all of this is that these are all reasonable inferences, but not all of them inexorably lead to the ultimate conclusion the majority reaches, namely that the funds were Auto Point's, not Ilya's. Because the facts here are not so one-sided as to demand that conclusion, the task of weighing them must be left to the trier of fact. See Gilhooley v. Cnty. of Union, 164 N.J. 533, 545 (2000) (stating that "it was not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact existed" and that "[o]nly when the evidence is utterly one-sided may a judge decide that party should prevail as a matter of law" (citing Brill, supra, 142 N.J. at 540)). Our task, for summary judgment purposes, is to accept the inferences favorable to defendants that may reasonably be drawn from Ilya's certification, which clearly raise a genuine dispute as to a central material fact in this case.

The trial court should not have rejected Ilya's certification on credibility grounds, see D'Amato, supra, 305 N.J. Super. 109 at 114-15 (explaining that credibility issues

must always be reserved for the trier of fact), and, at that, merely because defendants failed to participate in a proceeding to which they had never been made a party. The case on which the majority relies, Shelcusky, supra, 172 N.J. at 199-202, is not to the contrary. It authorizes use of the sham affidavit doctrine on summary judgment to reject an affidavit that contradicts the affiant's own prior statements or position so as to invent a dispute of material fact. Ibid. That was not the case here, and the trial court never recognized it as such, but explicitly made a credibility evaluation. The judgment must be reversed for that reason alone.

Moreover, plaintiffs' breach of contract claim should have been dismissed. Margolis could not pursue such a claim, because it was never a party to the settlement agreement. Parkway Ins. Co. v. N.J. Neck & Back, 330 N.J. Super. 172, 186-87 (Law Div. 1998). Globe could do so, but, for the following reasons, the record was sufficient to establish as a matter of law that defendants complied with the explicit terms of the agreement, contrary to plaintiffs' allegations.

It is well settled that the "'settlement of litigation ranks high in our public policy.'" Brundage, supra, 195 N.J. at 601 (quoting Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App. Div.), certif. denied, 35 N.J. 61 (1961)). This strong

public policy is based upon "'the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Ibid. (quoting Peskin v. Peskin, 271 N.J. Super. 261, 275 (App. Div.), certif. denied, 137 N.J. 165 (1994)). Thus, courts give effect to the terms of a settlement wherever possible and honor them "'absent compelling circumstances.'" Ibid. (quoting Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)).

Settlement agreements are generally governed by principles of contract law. Thompson, supra, 190 N.J. at 379. Therefore, they may be entered freely and enforced like all other contracts. Pascarella, supra, 190 N.J. Super. at 124-25. In interpreting a contract, the focus is on "'the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded.'" Lederman, supra, 385 N.J. Super. at 339 (quoting Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 774 (D.N.J. 1999)). "'[C]ourts should interpret a contract considering the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" Id. at 340 (quoting Biovail

Corp., supra, 49 F. Supp. 2d at 774) (internal quotation omitted).

> Significantly, our Supreme Court has held that "the legal effect of a release on other parties should be determined by the intent of the parties to the release, with due consideration being given to whether the compensation paid was fully adequate." Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 559 (1980). Similarly, we have observed that "a release of a defendant will release him only in respect of those claims by those parties as are actually or intended to be encompassed thereby." Goncalvez v. Patuto, 188 N.J. Super. 620, 629 (App. Div. 1983). "[A] release is merely a form of contract and the general rules that apply to contract interpretation apply to releases." Domanske v. Rapid-American Corp., 330 N.J. Super. 241, 246 (App. Div. 2000).
>
> [Sweeney v. Sweeney, 405 N.J. Super. 586, 596-97 (App. Div.), certif. denied, 199 N.J. 519 (2009).]

Contractual interpretation, such as of the settlement agreement at issue here, is a legal matter ordinarily suitable for resolution on summary judgment. Celanese Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). The touchstone for interpretation is the parties' shared intent in reaching the agreement, Pacifico v. Pacifico, 190 N.J. 258, 266 (2007), and, so long as that intent is evident from the contract's clear, unambiguous terms, the agreement will be enforced as written. Karl's Sales, supra, 249 N.J. Super. at 493.

To the extent any ambiguity exists, that is, to the extent that a contractual term is susceptible of more than one reasonable interpretation, <u>Powell v. Alemaz, Inc.</u>, 335 <u>N.J. Super.</u> 33, 44 (App. Div. 2000), a court may discern the parties' intent from evidence bearing on the circumstances of the agreement's formation, <u>Conway v. 287 Corporate Ctr. Assocs.</u>, 187 <u>N.J.</u> 259, 269 (2006), and of the parties' behavior in carrying out its terms, <u>Savarese v. Corcoran</u>, 311 <u>N.J. Super.</u> 240, 248 (Ch. Div. 1997), <u>aff'd</u>, 311 <u>N.J. Super.</u> 182 (App. Div. 1998). The required factual inquiry to resolve any such ambiguity typically precludes summary judgment unless the evidence is so one-sided as to compel judgment as a matter of law for one party or the other. <u>Great Atl. & Pac. Tea Co., Inc. v. Checchio</u>, 335 <u>N.J. Super.</u> 495, 502 (App. Div. 2000).

The agreement here plainly provided that defendants would have to timely pay the settlement amount by certified or attorney trust account check, that Julia would guarantee the obligation if payment were not made in that manner, and that only "[u]pon full payment in accordance" with the terms of the agreement, would the stipulation of dismissal be filed. The parties do not dispute that defendants timely presented two cashier's checks totaling the full amount of their settlement obligation and that plaintiffs filed the stipulation of

dismissal. The checks were honored, and the funds were neither counterfeit nor stolen.

Ordinarily, cashier's checks are the functional equivalent to cash, Parks v. Commerce Bank, 377 N.J. Super. 378, 380 (App. Div. 2005), and "[u]nless otherwise agreed, if a certified check, cashier's check, or teller's check is taken for an obligation, the obligation is discharged to the same extent that discharge would result if an amount of money equal to the amount of the instrument were taken in payment of the obligation." N.J.S.A. 12A:3-310(a). Moreover, Margolis accepted the checks notwithstanding that one clearly listed someone other than defendants as the remitter, and Globe filed the stipulation of dismissal, confirming its understanding that defendants had satisfied the terms of the agreement. See Savarese, supra, 311 N.J. Super. at 248 (intent of parties may be discerned from their behavior in carrying out the agreement). In other words, defendants satisfied those terms no matter whose funds were used to pay the settlement. Consequently, the primary dispute here, ownership of the funds, is not one of material fact with regard to this particular theory of liability, and defendants should have been granted summary judgment on the breach of contract claim.

Nor, for that matter, may plaintiffs pursue their indemnification claim specifically against Julia as guarantor. The settlement agreement explicitly provided that Julia's obligation in that capacity was only triggered insofar as Ilya failed to timely deliver payment by certified or attorney trust account check. Because he discharged that obligation, Julia may no longer be called upon to satisfy the terms of the settlement agreement as guarantor. See Ctr. 48 Ltd. P'ship v. May Dep't Stores Co., 355 N.J. Super. 390, 405 (App. Div. 2002) (explaining that a "guarantor is not bound beyond the strict terms of its promise and its obligation cannot be extended by implication").

That said, both defendants may still have liability here. The trier of fact could find, for example, that defendants arranged the transfer knowing that the funds would likely be subject to recovery in an impending bankruptcy with the intention that Globe thereby unknowingly risks losing the benefit of the agreement. In that case, defendants could be liable for breach of an implied covenant of good faith and fair dealing, Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997), despite their compliance with the express terms of the settlement agreement, Wilson v. Amerada Hess Corp., 168 N.J.

236, 244 (2001).[3] If it is found, based upon any additional evidence presented, defendants knowingly misrepresented to Globe there would be no such risk, with the intention that Globe reasonably rely on that misrepresentation in order to agree to the settlement, defendants could be liable for fraud. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

Moreover, even in the absence of bad faith or fraud on defendants' part, there remains a common-law claim for indemnification. Ilya was undisputedly the one who arranged the transfers, and both defendants were beneficiaries of those transfers insofar as they satisfied their settlement obligations. If the evidence establishes the transfers were fraudulent and plaintiffs accepted them in good faith, plaintiffs could equitably call at least upon Ilya for indemnification, particularly under the peculiar circumstances of this case. See Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 190 (1986) (noting that "one who in good faith and at the direction of another commits a tort is allowed indemnity against the person who caused him to act"); see also

---

[3] To be sure, this course of conduct would also constitute a breach of contract, 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 461 (App. Div. 2004), in the sense that the breach is of a covenant implied in the contract, Wilson, supra, 168 N.J. at 244. But our courts also recognize breach of the implied covenant as a separate cause of action, see id. at 240, 244, and plaintiffs pleaded it as such here.

<u>Promaulayko v. Johns Manville Sales Corp.</u>, 116 <u>N.J.</u> 505, 511 (1989) (explaining common-law indemnity as an equitable doctrine). Alternatively, defendants could be held liable for unjust enrichment to the extent that they received the benefit of the transfers, and the trial court concludes that it would be inequitable to permit them to keep that benefit without remunerating plaintiffs. <u>Callano v. Oakwood Park Homes Corp.</u>, 91 <u>N.J. Super.</u> 105, 108-09 (App. Div. 1966).

Plaintiffs have advanced all of these claims. Whether any would prove successful in a trial, of course, would depend on whether the funds were actually subject to recovery in the bankruptcy action. Further, to the extent any of the theories of liability advanced here sound in equity, recovery would be premised upon plaintiffs' good faith and the reasonableness of their settlement with the bankruptcy trustee. Worthy of note in this regard is that Margolis appears to have had significant basis upon which to avoid liability in the adversary proceeding as a "mere conduit" of the funds to its client, rather than as an "initial transferee" liable to the estate under the bankruptcy code, <u>Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.)</u>, 33 <u>B.R.</u> 334, 336-37 (Bankr. S.D.N.Y. 1983), even if, as the case may be here, it kept its fee and remitted only the balance to Globe, <u>Kirschenbaum v. Leeds Morelli & Brown P.C.</u>

(In re Robert Plan of N.Y. Corp.), 456 <u>B.R.</u> 150, 159-60 (Bankr. E.D.N.Y. 2011). For reasons not apparent in the record, it did not pursue this defense in the adversary proceeding. Consideration of its failure to do so, along with the weighing of any equities, would be relevant to any award of attorney's fees to it, as well.

In sum, I dissent, as the judgment in plaintiffs' favor should be reversed, and the matter remanded for dismissal of plaintiffs' breach of contract claim, as well as their indemnification claim against Julia as guarantor, and for further proceedings on their remaining claims.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION